**GREAT AMERICAN INSURANCE COMPANIES**

v.

**The M/V ROMERAL, etc., et al.**

No. 95–1626.

United States District Court, E.D. Louisiana.

Aug. 22, 1996.

F.A. Courtenay, Jr., Donald J. Volpi, Jr., Philip S. Brooks, Jr., Courtenay, Forstall, Guilbault, Hunter & Fontana, New Orleans, LA, for Plaintiff, Great American Insurance Companies.

Gary A. Hemphill, New Orleans, LA, for Defendant, Compania Sud American Vapores S.A., d/b/a Chilean Line.

Harvey G. Gleason, Whitney L. Cole, Wagner, Bagot & Gleason, New Orleans, LA, for Defendants, London Bridge Shipping Corp., Ltd. and V. Ships Shipping Management, S.A.M.

## ORDER AND REASONS

MENTZ, District Judge.

This suit involves a claim for cargo damage suffered during the voyage of the

CSAV ROMERAL[1] from New Orleans, Louisiana to Valparaiso, Chile. Before the court are cross-motions for partial summary judgment filed by plaintiff Great American Insurance Companies (Great American),[2] and defendant Compania Sud Americana De Vapores d/b/a Chilean Line (Chilean Lines), the charterer of the CSAV ROMERAL. The issue presented in the cross-motions is whether the carriage of cargo constituted an unreasonable deviation from the contract of carriage. If so, then the defendants may not benefit from the $500.00 per package limitation of liability under the Carriage of Goods by Seas Act (COGSA), 46 U.S.C. § 1300, et seq.[3]

## FACTS

It is undisputed that on approximately June 17, 1994 a consignment consisting of a Caterpillar tractor was loaded in good order and condition aboard the CSAV ROMERAL in New Orleans, Louisiana for shipment to Valparaiso, Chile. The tractor was loaded onto a flat rack container and stowed on the deck of the vessel on top of other containers. According to the bill of lading, the tractor was to be delivered to the port of Valparaiso, Chile.

After leaving New Orleans, the vessel called at the port of Cristobal, Panama to load or unload other cargo. While at Cristobal, the tractor was shifted to facilitate the movement of other cargo. During this process, the tractor was damaged in two separate incidents. The tractor was left at Cristobal and later picked up by the M/V LONTUE and carried to Valparaiso where it was discharged in its damaged condition. At issue is whether the damage occurred as a result of an unreasonable deviation thereby stripping defendants of their statutory and contractual right to limit liability to $500.00.

## ANALYSIS

■ COGSA sets forth the liability of the ocean carrier and provides for the recovery of damages in cargo cases. COGSA allows carriers to limit their liability for damaged goods to $500 per package, unless the shipper declares the value of the goods and it is inserted in the bill of lading. Section § 1304(5) of COGSA provides:

Neither the carrier or the ship shall in any event be or become liable for any loss or damage to or in connection with the transportation of goods in an amount exceeding $500.00 per package ..., or in case of goods not shipped in packages, per customary freight unit, ... unless the nature and value of such goods have been declared by the shipper before shipment and inserted in the bill of lading.

46 U.S.C. § 1304(5). A carrier loses this protection and becomes liable for the full value of the goods, or the full cost of repairing damage to the goods, if the carrier commits an unreasonable deviation from the contract of carriage with the shipper. 46 U.S.C. § 1304(4). See Constructores Tecnicos, S. de R.L. v. Sea–Land Service, Inc., 945 F.2d 841, 844 (5th Cir.1991); Spartus Corp. v. S/S YAFO, 590 F.2d 1310 (5th Cir.1979) (holding that unreasonable deviation renders § 1304(5) inapplicable). A deviation is "a 'serious departure from the contract of carriage,' exposing the cargo to 'unanticipated and additional risks.'" See Nemeth v. Gen-

1. Incorrectly named in the complaint as the M/V ROMERAL.

2. Great American is the insurer of the cargo at issue and became subrogated to the rights of the cargo owners.

3. The other defendants, London Bridges Shipping Corp., Ltd. (London Bridges), identified as the owner of the CSAV ROMERAL, and V. Ships Shipping Management, S.A.M. (V. Ships), whose capacity is not specified in any of the pleadings, did not file a cross-motion. Instead, they filed a memorandum in opposition to Great American's motion for partial summary judgment in which they argued, *inter alia*, that they may not be held liable under COGSA because they are not carriers. A vessel owner is liable *in personam* under COGSA only if the owner is a carrier. *Pacific Employers Ins. Co. v. M/V GLORIA*, 767 F.2d 229, 236 (5th Cir.1985).

The court recognizes that the issue of unreasonable deviation arises under COGSA; however, as there is no motion for summary judgment on the issue of carrier status or liability under COGSA, the court is unable on the present record to address the merits of London Bridges' and V. Ships' argument that they should be dismissed as non-carriers.

*eral S.S. Corp., Ltd.*, 694 F.2d 609, 613 (9th Cir.1982) (and cases cited therein).

The provisions of COGSA are clearly incorporated into the bill of lading through the Clause Paramount found in section 2 of the bill of lading. In addition, section 16 of the bill of lading contains its own limitation of liability:

> In the event of any loss or damage to Goods, neither the Carrier nor the Ship shall in any event be or become liable for any loss or damage to or in connection with the transportation of Goods in an amount exceeding $500.00 per package....

In an effort to negate the limitation of liability, Great American claims that an unreasonable deviation from the contract of carriage occurred. Great American contends that the vessel deviated from the contract voyage by calling at an intermediate port, by shifting the tractor to load and unload other non-related cargo, and by stowing the tractor on the deck of the vessel in contravention of the clean bill of lading.

### A. Geographic Deviation

A geographic deviation occurs when there is a change in route beyond the customary course of the voyage. *Spartus Corp.*, 590 F.2d at 1313. The alleged geographic deviation in this case occurred when the CSAV ROMERAL made an intermediate stop in Cristobal, Panama.

The CSAV ROMERAL was engaged in a liner service operated by the vessel charterer in this case, Chilean Lines, pursuant to which its schedule and ports of call were published in a tariff filed with the Federal Maritime Commission as well as in advertisements in commercial publications. Both the tariff and the advertisements for the vessel show that it made regularly scheduled stops at various ports between New Orleans and Valparaiso, including Cristobal, Panama, to load and discharge cargo.

"[S]tops at a vessel's customary ports of call, whether or not the bills of lading list those ports, cannot constitute deviations so long as the carrier has made those stops known to the shipper or the shipping community generally through advertisement, publication, or other means." *Goya Foods, Inc. v.*

*S.S. ITALICA*, 561 F.Supp. 1077, 1086 (S.D.N.Y.1983), *aff'd*, 742 F.2d 1434 (2nd Cir. 1983). *See also Italusa Corp. v. M.V. THALASSINI KYRA*, 733 F.Supp. 209, 217 (S.D.N.Y.), *aff'd*, 916 F.2d 709 (2d Cir.1990) and *Cera–Tech v. S/S ALLISON LYKES*, 1992 A.M.C. 2089, 2102, 1991 WL 94178 (E.D.La.1991) (the shipper is placed on notice of the vessel's established and published routes).

In addition to the publications in this case, the bill of lading gave notice to the shipper that the vessel could make stops at its usual and customary or advertised ports of call. Section 4 of the bill of lading defines the scope of the voyage to include:

> usual or customary or advertised ports of call whether named in this contract or not, also ports in or out of the advertised geographical usual or ordinary route or order, even though in proceeding thereto the Vessel may sail beyond the port of discharge or in a direction contrary thereto, or depart from the direct or customary route.

Therefore, there is no genuine issue of material fact that the shipper in this case knew or should have known that the vessel would not sail directly from New Orleans to Valparaiso, but would instead follow its regularly scheduled and advertised route which included stopping in Panama. The uncontroverted evidence is that the vessel in fact followed its advertised and published customary route. As there is no dispute that the stop in Panama was customary, the court finds as a matter of law that there was no geographic deviation in this case.

### B. Deviation By Shifting Cargo

Great American urges that it was an unreasonable deviation for the CSAV ROMERAL to shift and restow the tractor in order to move other cargo being handled in the port of Cristobal.

"Conduct that is customary in the trade is not a deviation from the contractual voyage because such contracts ordinarily presume that the parties will follow the customs and usages of the maritime trade." *SPM Corp. v. M/V MING MOON*, 965 F.2d 1297, 1303 (3d Cir.1992).

■ The uncontroverted evidence in this case establishes that it is a customary practice in the maritime industry to restow cargo loaded on flat racks at intermediate ports of call in order to facilitate the handling of other cargo. *See Amdahl Corp. v. Profit Freight Sys., Inc.,* 65 F.3d 144, 147 (9th Cir.1995) (restowing the cargo on another vessel to complete the voyage was not unreasonable deviation); *M/V MING MOON,* 965 F.2d at 1299 (holding that restowage at intermediate ports is customary in the maritime industry and therefore does not constitute a deviation from the contract of carriage).

In addition, it appears from language in the Liberties Clause, section 8 of the bill of lading, that the parties contemplated the possibility that cargo would be moved, even from one vessel to another:

> The carrier may substitute another vessel or forward the goods by a subsequent vessel or vessels or before or after the commencement of the voyage may transfer the goods from point of receiving to point of loading or from point of discharge to point of delivery or from one dock to another, by any usual means of conveyance, or may forward and/or relay the whole or any part of the goods to any other vessel whether operated by the carrier or by others at the original point of shipment or at any other place or places and when necessary may forward the goods by any other means. Any and all rights and exemptions accorded to the Vessel named to this Bill of Lading shall likewise apply to any of the conveyances mentioned in this clause.

While it is true that liberty clauses "are unenforceable to the extent they authorize unreasonable deviations," *see Yang Mach. Tool Co. v. Sea–Land Serv., Inc.,* 58 F.3d 1350, 1353 (9th Cir.1995), the circumstances of this case in light of the uncontroverted evidence of custom in the industry, do not amount to an unreasonable deviation.

The court finds that the case Great American relies upon, *Transatlantic Marine Claims Agency, Inc. v. S.S. AMERICAN LEADER,* 1986 A.M.C. 1253, 1986 WL 1191 (S.D.N.Y.1986), is not persuasive authority in the case at bar. In *Transatlantic Marine*

the cargo was damaged after it was removed from the vessel and was being carried "some distance" away from the vessel by a truck, a situation not contemplated by custom, the parties, nor provided for in the bill of lading. The facts did not establish as a matter of law the existence of any custom, nor any contractual provision which would have authorized restowage. The court held that the unsuccessful restowage of a flat-rack container in an operation that involved carrying the cargo away from the vessel by truck is a deviation from the contract of carriage. The court left unresolved the reasonableness of that procedure.

The holding in *Transatlantic Marine* should be limited to its specific facts, especially in light of the Fifth Circuit's acknowledgement that "[t]he notion of non-geographic deviation may be 'of doubtful justice under modern conditions, of questionable status under COGSA, and of highly penal effect.'" *Rockwell Int'l Corp. v. M/V INCOTRANS SPIRIT,* 998 F.2d 316, 319 (5th Cir.1993) (quoting Grant Gilmore and Charles Black, Jr., *The Law of Admiralty* § 3042 at 183 (2d ed. 1975)).

There is no suggestion that the restowage procedure in this case involved any irregular or unusual carriage of the cargo such as the truck used in *Transatlantic Marine.* Considering the uncontroverted evidence of custom, the clear language contained in the bill of lading, and the other uncontested facts, the court finds as a matter of law that the shifting and attempted restowage of the tractor to facilitate loading of other cargo at Cristobal, Panama is not a deviation from the contract of carriage.

### C. Deviation By On–Deck Stowage

The tractor in this case was placed on a flat-rack[4] because it was too large to fit into a container. It was stowed on top of other containers on the deck of the vessel. Great American contends that the stowage of the tractor on the deck of the vessel constitutes an unreasonable deviation.

■ As a general rule, a shipper with a clean bill of lading, meaning that the bill of

---

**4.** A flat-rack is a chassis or bed to which a shipper lashes the cargo.

lading is silent as to particulars of stowage either on deck or below deck, is entitled to presume that the cargo is contracted for below deck carriage. *Ingersoll Milling Machine Co. v. M/V BODENA,* 829 F.2d 293 (2d Cir.1987), *cert. denied,* 484 U.S. 1042, 108 S.Ct. 774, 98 L.Ed.2d 860 (1988); *Blasser Bros. v. Northern Pan–American Line,* 628 F.2d 376, 384 n. 13 (5th Cir.1980). It is the carrier's burden to overcome that presumption with evidence of an express agreement to the contrary or a port custom permitting on-deck stowage. *Ingersoll,* 829 F.2d at 299. "Where a carrier can show that the on-deck stowage is customary, there has been no deviation and the issue of reasonableness does not arise." *Electro–Tec Corp. v. S/S DART ATLANTICA,* 598 F.Supp. 929, 930 (D.Md.1984).

 This case involves a clean bill of lading. Chilean Lines has presented uncontroverted evidence that it is custom in the industry for oversized cargo to be stowed on a flat-rack placed on top of other containers on the deck of the vessel. Chilean Lines offered two uncontroverted affidavits from Ronald J. Brunet, General Traffic Manager with Strachan Shipping Co., a New Orleans steamship agency operating as agent for many carriers in and around the port of New Orleans. His affidavit establishes that it is a well-known and customary industry practice to stow oversized cargo such as the tractor in this case on a flat-rack and to stow it on deck on top of other containerized cargo. *See also O'Connell Machinery Co., Inc. v. M.V. "AMERICANA,"* 797 F.2d 1130, 1133 (2nd Cir.1986) (accepting testimony that general international custom is to stow flat-racks on-deck as evidence that deck stowage is not unreasonable). Therefore, the court finds as a matter of law that the on-deck stowage does not constitute a deviation from the contract of carriage.

 Even if the on deck stowage is this case was a deviation, the court finds as a matter of law that the deviation was reasonable. It is undisputed that the damage in this case occurred as a result of shifting and restowing cargo, rather any risks generally associated with on-deck stowage such as wind, water, or sea spray. *See Id.* at 1133.

*Cf. du Pont De Nemours Int'l S.A. v. S.S. MORMACVEGA,* 367 F.Supp. 793, at 798–800 and *Electro–Tec Corp.,* 598 F.Supp. at 933–34 (on-deck stowage may be reasonable given the design of certain modern vessels and the practical stowage needs of certain types of cargo).

Accordingly,

IT IS ORDERED that:

(1) The motion for partial summary judgment filed on behalf of plaintiff Great American Insurance Companies is **DENIED.**

(2) The motion for partial summary judgment filed on behalf of Compania Sud Americana De Vapores S.A. d/b/a Chilean Line is **GRANTED,** finding that the carrier liability in this case is limited to $500.00 per package.